# EXHIBIT 1

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF KENT

DR. WILLIAM L. MILLER and
JANET G. MILLER,

Plaintiffs,

v

JOHN (JACK) BOYKO, JR.; and DAY &
SAWDEY, P.C.,

Defendants.

File No. 11-       NM

Hon.

Thomas H. Blaske (P26760)
John F. Turck IV (P67670)
BLASKE & BLASKE, P.L.C.
Attorneys for Plaintiffs
500 South Main Street
Ann Arbor, Michigan 48104
(734) 747-7055

## COMPLAINT

There is another civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court. That case was *Miller, et al v Wensel, et al* which was filed in the Washtenaw County Circuit Court as File No. 09-662 CH and assigned to Hon. David S. Swartz. That case is no longer pending.

Thomas H. Blaske (P26760)

SKE & BLASKE, P.L.C.

ATTORNEYS AT LAW

) SOUTH MAIN STREET
N ARBOR, MI 48104
(734) 747-7055

PB THB 016180

Plaintiffs, by and through their attorneys, Blaske & Blaske, P.L.C., for their Complaint say as follows:

## JURISDICTIONAL ALLEGATIONS

1.    This is a legal malpractice case.

2.    At the time of the acts of malpractice alleged herein, Plaintiffs were residents of Kent County, Michigan.

3.    Defendant John (Jack) Boyko, Jr. (hereinafter sometimes Mr. Boyko) was and is an attorney who represented both Plaintiffs and who, at that time, maintained his principal place of business in Grand Rapids.

4.    Defendant Day & Sawdey, P.C. (hereinafter sometimes Day & Sawdey) was a law firm at which Mr. Boyko worked during the most relevant and critical times when he represented Plaintiffs in 2003.

5.    That law firm was the employer of Mr. Boyko and received fees for his services to Plaintiffs.

6.    Day & Sawdey maintained its principal place of business in Kent County.

7.    All of the most significant acts of professional negligence alleged in this Complaint occurred in Kent County.

8.    Plaintiffs have been harmed by the professional negligence of Mr. Boyko, their attorney, in an amount which exceeds the $25,000 jurisdictional minimum of this court, and most likely exceeds several millions of dollars.

:E & BLASKE, P.L.C.

TORNEYS AT LAW

SOUTH MAIN STREET
I ARBOR, MI 48104
734) 747-7055

PB THB 016181

## STATEMENT OF FACTS

9. Mr. Boyko had been the only personal and business attorney for Dr. and Mrs. Miller since 2000.

10. For many years, Dr. and Mrs. Miller lived in Ada.

11. During most of those years they had dreamed of making a farmland purchase.

12. Finally, in the late summer and early fall of 2003, the Millers found a property located in Lima Township, Washtenaw County (which later was and may be more conveniently identified as 9255 Twin Oaks).

13. The scope of Mr. Boyko's undertaking with respect to the purchase of this Lima Township property was extensive, and it included, but was not limited to, the giving of legal advice and, as needed, preparation and review of documentation regarding the farmland purchase and lease of contiguous property and advice about that documentation.

14. Mr. Boyko drafted both the sales agreement and a lease agreement.

15. He knew that the Millers would be making a very substantial investment in the property.

16. He knew that the Millers were building a horse farm on it.

17. He knew that both Dr. and Mrs. Miller would be using the land and their buildings on it as a platform on which and place where they would be conducting businesses for profit.

18. In 2002 the Millers told Mr. Boyko they were searching for property to build a farm and they may even wish to have their business, 4G Innovation, L.L.C., purchase the

(E & BLASKE, P.L.C.

TORNEYS AT LAW

SOUTH MAIN STREET
I ARBOR, MI 48104
734) 747-7055

Page 3 of 19

PB THB 016182

farm because it would provide business income (both from operating the farm as a commercial business for horse boarding and as a horse show facility and as other businesses from consulting) and they advised Mr. Boyko that the farm would house several other family business offices.

19.  Mr. Boyko knew throughout that he was asked in scope – and exact words – to "be sure that everything is okay."

20.  With the advice and counsel of Mr. Boyko, the Millers had been looking for such a place for many years.

21.  Because they wanted land, among other things, to build a horse farm on, it was specifically known to Mr. Boyko that the place would harbor many animals, ordinances should have been looked for by Mr. Boyko.

22.  Dr. and Mrs. Miller had previously discovered a potential piece of land on the west side of the state, and a realtor there had told them that they had to be very careful of ordinances.

23.  They had previously found a potential piece of land in Cascade Township, but an applicable density ordinance restricted how they could use it, and specifically prevented them from using the Cascade Township land as a horse farm.

24.  The Millers had told Mr. Boyko about these experiences.

25.  They had told him that they specifically wanted him to check out the zoning ordinances because of these experiences.

26.  If he had done what they asked at Lima Township, it would have disclosed to him the ordinance in question.

E & BLASKE, P.L.C.

ORNEYS AT LAW

OUTH MAIN STREET
ARBOR, MI 48104
34) 747-7055

Page 4 of 19

PB THB 016183

27. Because he did not, it was not.

28. At that time, Lima Township had only one ordinance governing all of its development.

29. Because it was one ordinance, discovering the existence of the ordinance in question did not require an extensive search by Mr. Boyko.

30. The ordinance in question was even provided free for pickup at the Township offices.

31. The ordinance in question is even now available online.

32. Also the Township will fax, for free, a copy of the ordinance in question to someone contemplating purchase of land.

33. The burden on Mr. Boyko of getting a copy of the ordinance in question would not have been great.

34. It would have been very easy for Mr. Boyko to obtain a copy of the ordinance in question had he made an effort to get it.

35. Also in the lease agreement which Mr. Boyko drafted there was an agreement that the Ottenbergs would move the driveway which was on the land at the time the Millers purchased it.

36. The Millers had asked Mr. Boyko to please make sure that the moving of the Ottenbergs' driveway fixes the problem, and if Mr. Boyko had made sure that the moving of the Ottenbergs' driveway did fix the problem then he would have found out about the ordinance because the Township officials would have pulled it and handed it to him.

37. They did not because he did not.

E & BLASKE, P.L.C.

ORNEYS AT LAW

OUTH MAIN STREET
ARBOR, MI 48104
'34) 747-7055

Page 5 of 19

PB THB 016184

38. The Millers also told Mr. Boyko that the property's perk situation required an engineered septic field, and so they asked him to be sure that that would be okay.

39. Had Mr. Boyko looked for a Lima Township ordinance regarding engineered septic fields he would have also found the entire ordinance in question and he would have been alerted to its other provisions.

40. He did not and he was not so alerted.

41. Through a referral to a commercial real estate agent, the Millers found an unlisted 10-acre parcel in Lima Township owned by the Ottenbergs, who in total owned 80 acres and who wanted to split off three 10-acre parcels in a development.

42. In 2002 the Ottenbergs built a private road to provide proper access to all the parcels to be spilt.

43. Lima Township told the Ottenbergs them that a private road was required to comply with the 1979 Lima Township ordinance, which required all parcels to directly abut either a public or a private road.

44. The Ottenberg's attempted split of the three 10 acre parcels had failed because none of the parcels perked.

45. Therefore, to make a sale, the Ottenbergs had to split off a different parcel, which was the one sold to the Millers, which contained their driveway and which did not abut the private road.

46. This is the genesis of the particular 10-acre parcel that the Ottenbergs offered and sold to the Millers.

E & BLASKE, P.L.C.

fORNEYS AT LAW

OUTH MAIN STREET
ARBOR. MI 48104
'34) 747-7055

PB THB 016185

47. This split was done fraudulently because the Ottenbergs stated that the parcel which they sold to the Millers abutted the private road.

48. It did not.

49. The parcel in question required an easement for access, in violation of the ordinance.

50. At the time, the Millers were not aware of either the ordinance or of the violation.

51. As their attorney, Mr. Boyko should have been.

52. Consistent with his ongoing role as the family business and real estate attorney, the Millers asked Mr. Boyko to advise them throughout the extended process of drafting an augmented and lengthy sales agreement which would protect the Millers and give them the right to lease the adjacent 10 acres which was to become part of their farm.

53. These additional 10 acres were essential to operate the farm as a commercial horse show facility and eventually would have to be purchased by the Millers, so a purchase option was required in the sales agreement.

54. Many weeks of editing and negotiating passed with Mr. Boyko providing several edited drafts of the needed documents.

55. On several occasions the Millers asked Mr. Boyko to be sure to thoroughly investigate and to make sure all aspects of the parcel were okay for them to buy and on which they could build a new farm with a house, barn arena, hay barn and personal business offices.

56. Architectural drawings for the planned farm buildings were required to be part of the sales agreement so the Ottenbergs could approve the design and quality of planned construction.

Ξ & BLASKE, P.L.C.

°ORNEYS AT LAW

OUTH MAIN STREET
ARBOR, MI 48104
'34) 747-7055

Page 7 of 19

PB THB 016186

57. Provisions to protect the Millers were written into the agreement, such as a contingency for drilling a well and subsequently verifying that it would meet standards for flow and water quality, all before purchasing the parcel.

58. On September 30, 2003 at 5:06 pm Mr. Boyko advised Dr. Miller that he had "reviewed the closing documents" and that "they are in order."

59. In fact, Mr. Boyko had failed to discover or disclose two very significant problems with this property.

60. One of these had to do with whether or not a certain easement for access, more particularly described below, would be permanent – or not.

61. The other of these was an applicable Lima Township ordinance, more particularly described below, requiring that land which was to be built on abut a public road.

62. Had Mr. Boyko exercised that care and caution on behalf of his clients which a lawyer of ordinary learning, judgment or skill when confronted by the same or similar circumstances would have exercised, both of these serious problems with the property – both the easement and the ordinance – would have been discovered and disclosed in advance of the purchase of the Lima Township property by Dr. and Mrs. Miller.

63. As a result of Mr. Boyko's advice and in reliance on it, Dr. and Mrs. Miller did what they would not otherwise have done – namely, they closed on the purchase of that Lima Township land.

64. Dr. and Mrs. Miller thereafter built on that land what they had hoped was going to be their dream home, a 10-acre horse farm with an adjacent 10 acres leased by them

: & BLASKE, P.L.C.

ORNEYS AT LAW

OUTH MAIN STREET
ARBOR, MI 48104
34) 747-7055

Page 8 of 19

PB THB 016187

(a transaction in which Mr. Boyko was also involved as their attorney at the same time).

65.  Instead of building their dream home by purchasing the Lima Township land, Dr. and Mrs. Miller entered into a nightmare of contention and litigation.

66.  Even after they purchased the Lima Township land, Mr. Boyko continued to provide related legal services to Dr. and Mrs. Miller, including throughout their construction on the parcel, not limited to review of proposed construction loan title insurance, construction contract disputes and construction lien removals from shortly after purchase in 2003 through sometime in 2006.

67.  Dr. and Mrs. Miller did not become aware of the professional negligence which gave rise to their multiple legal predicaments related to the Lima Township land until May 7, 2009, when they first learned of the 30-year argument regarding the easement in question.

68.  Dr. and Mrs. Miller did not learn of the ordinance violation until September 2009.

69.  Apparently neither did Mr. Boyko, because if he did, he never told either Dr. or Mrs. Miller about either of these problems.

70.  The parties to this case entered into a certain tolling agreement which, by its terms, operates to toll the statute of limitations under MCL 600.5838(2) until August 30, 2010.

71.  The parties to this case then mutually agreed to extend the terms of that tolling agreement which, by the terms of that mutual agreement, operates to toll the statute of limitations until _____.

& BLASKE, P.L.C.

ORNEYS AT LAW

UTH MAIN STREET
RBOR, MI 48104
14) 747-7055

Page 9 of 19

PB THB 016188

72. Washtenaw County Circuit Court Case No. 09-662 CH, referenced as part of the caption of this case, involved litigation among the Millers and their former neighbors, the Wensel family, related to the existence and permanence of a certain easement on the property.

73. That same Washtenaw County litigation also involved litigation among the Millers and their former neighbors and the sellers, the Ottenberg family, related to both the easement issues and also the effects on the Millers of the previously mentioned Lima Township Ordinance.

74. By its June 1, 2010 order dismissing the case, that Washtenaw County litigation has, at long last and after much attendant legal and other expense, mental anguish, harm and loss to Dr. and Mrs. Miller, been concluded.

75. The easement in question is a three-page document entitled Restriction Agreement and Easement for Ingress and Egress dated August 27, 1976 and recorded in Washtenaw County Register of Deeds at Liber 1562 page 851 on September 2, 1976.

76. That easement document created a 66-foot wide easement, 1,323 feet long, for ingress, egress and utilities.

77. It also created a 10-foot wide driveway in the easement of 900 feet in length.

78. It described the easement as "permanent," but it also specified that the contractual obligations under that easement document would remain in full force and effect for 30 years.

79. The easement required majority approval for any improvements to the easement.

80. The easement was binding on all successors and assigns.

E & BLASKE, P.L.C.

TORNEYS AT LAW

;OUTH MAIN STREET
ARBOR, MI 48104
734) 747-7055

Page 10 of 19

PB THB 016189

81. The Wensels contended, to the grave detriment of Dr. and Mrs. Miller, that the 30-year limitation did not make the easement permanent, but instead meant that it would and did expire 30 years after it was executed; namely, that it would expire in 2006.

82. The Lima Township ordinance in question, which doubtless applied and applies to the property purchased by the Millers, was adopted in 1979.

83. That ordinance was adopted, in part, to reduce controversies among neighbors over access easements.

84. Among other things, that ordinance required that houses built on empty land then existing in the Township abut either a private or a public road.

85. The Millers' house, which was built by them on the land they had purchased there, does neither.

86. Nor could it on the parcel as configured.

87. The neighbors whose property was crossed by the easement in question, which was used for a driveway to the Miller's property, were the Wensels.

88. Mr. Wensel had, in public hearings, strongly objected to construction of the nearby private road because he wanted it extended so that, if the Ottenbergs had split off three 10-acre parcels as they had said they would in the proposed design of the private road, then the remaining Parcel 2 shown on the survey of that land would been owned by the Ottenbergs and would have been in violation of the ordinance.

89. Therefore, had all the true facts been known, trouble for the Millers should have been anticipated from the Wensels.

90. The Wensels also wanted to split off parcels from their property and sell them.

E & BLASKE, P.L.C.

TORNEYS AT LAW

OUTH MAIN STREET
ARBOR, MI 48104
'34) 747-7055

Page 11 of 19

PB THB 016190

91. Mr. Wensel and other neighbors cited the problem with the potential expiration of the easement in 2006.

92. Other neighbors used the expiration as reason for objecting to construction of the private road.

93. Not until the Wensels and those other neighbors had been threatened with litigation did they abate their objections to construction of the private road.

94. Neighborhood relations over these matters were a veritable tinderbox.

95. Because of this history, a fractious dispute over the split of the Millers' parcel was likely.

96. If the private road had been extended, there would not have been a dispute because the Millers' parcel would not have used an easement for access.

97. The dispute began after the Wensels contended easement expired, in 2006.

98. They did not disclose the legal basis of their position, however, until much later.

99. In 2007 Mr. Wensel told the Millers that they had no right to use the easement for their driveway and their title was invalid.

100. Mr. Wensel did not reveal their contentions about expiration of the easement or the violation of the ordinance.

101. Dr. Miller contacted their title insurance company and the Wensels hired an attorney.

102. The title insurance company convinced the Wensels' attorney that the Millers had a right to use the easement.

103. Mr. Wensel withdrew his legal argument because his attorney advised him that the Millers had the right to use the easement for their driveway.

: & BLASKE, P.L.C.

ORNEYS AT LAW

JUTH MAIN STREET
ARBOR. MI 48104
34) 747-7055

PB THB 016191

104. Nevertheless, Mr. Wensel began to persistently harass the Millers, apparently believing that was his only viable option to get his way.

105. Mr. Wensel began a campaign of harassment both of the Millers and of their horses.

106. Mr. Wensel wanted the Millers to extend the private road so that he could then do parcel splits.

107. Mr. Wensel would frighten the Millers' horses by stalking them, by hiding behind shrubbery along the property line adjacent to the easement and then making noises with power tools and by digging for hours in a drainage basin.

108. Sometime in 2007 the harassment escalated with Mr. Wensel marching up and down the property line and the Millers' driveway for hours each day.

109. The harassment then escalated further when Mr. Wensel carried a loaded gun along the property line and discharged it into the shrubbery.

110. Mr. Wensel also had set up several chairs along the easement next to the driveway that he used to watch the Millers for hours each day.

111. This harassment threatened the safety of the Millers because, among other things, it made the Millers' horses dangerous to handle; even turnouts to pastures were no longer safe.

112. These threats to safety of the Millers by Mr. Wensel forced the Millers to move away from Lima Township in early 2009.

113. Even though the Millers found a potential buyer for the property in March 2009, the sale later fell through because of the title defects enumerated and because being in violation of the ordinance was an otherwise insoluble problem.

Page 13 of 19

E & BLASKE, P.L.C.

TORNEYS AT LAW

:OUTH MAIN STREET
ARBOR, MI 48104
734) 747-7055

PB THB 016192

114. Mr. Wensel, after learning of the possible sale by the Millers, continued his campaign by contesting validity of the Millers' title and by erecting a spite fence to interfere with the Millers' use of the driveway provided by the easement in question.

115. Al of these circumstances forced the Millers to back out of the potential sale.

116. Loss of the potential sale led to foreclosure of the property because litigation to quiet title took too long (longer than the Millers had before foreclosure happened) and because it was too costly and because the ordinance violation could never be resolved.

## STATEMENT OF THE CASE AND DETAILED DAMAGES

117. Mr. Boyko and his firm owed Plaintiffs, and each of them, the duty to provide them with such services as would attorneys of ordinary learning, skill or judgment when confronted by the same or similar circumstances.

118. In violation of these duties they:

a.   Failed to discern the possibility that the easement in question would or might expire in 30 years;

b.   Failed to advise either Dr. or Mrs. Miller that the easement in question would or might expire in 30 years;

c.   Failed to discover the existence of the Lima Township ordinance in question;

d.   Failed to advise either Dr. or Mrs. Miller of the existence of the Lima Township ordinance in question.

E & BLASKE, P.L.C.

ORNEYS AT LAW

OUTH MAIN STREET
ARBOR. MI 48104
(34) 747-7055

Page 14 of 19

PB THB 016193

119. As a direct and proximate result of Mr. Boyko's breaches of professional standards as noted, Dr. and Mrs. Miller have been injured and damaged in that they have, at great expense and harm to them, including mental anguish and lost profits in connection with business plans they had for the premises in question, all more fully described below, bought the Lima Township property and been embroiled in the aforementioned Washtenaw County lawsuit.

120. They have incurred substantial litigation expense, they have suffered significant mental anguish and emotional distress, they have lost profits and prospects from Dr. Miller's consulting business, 4G Innovation, L.L.C., a company which Mr. Boyko himself created.

121. They have suffered other injuries and damages compensable under Michigan's law of lawyering.

122. As already noted, the Millers' Lima Township farm was built in part to provide the them with a source of business revenue that had been carefully planned to begin in 2008.

123. The original $5,000 of funding for purchase of the farm was from 4G Innovation, L.L.C.

124. The sale agreement specified 4G Innovation, L.L.C. as owning an option for purchase of an additional 10 acres, and not the Millers as individuals.

125. The initial check written in July 2003 for $5,000 as a down payment on the land purchase was provided by 4G Innovation, L.L.C. and written on its account.

E & BLASKE, P.L.C.

ORNEYS AT LAW

OUTH MAIN STREET
ARBOR, MI 48104
34) 747-7055

Page 15 of 19

PB THB 016194

126. The harassment from Mr. Wensel already described and litigation over the title and easement and ordinance violation all forced the Millers to move and to list the farm for sale instead of developing business on it.

127. Their move from the farm ended the Millers' ability to pursue and conduct business on the farm.

128. Without income from the farm, and with clouds on marketability preventing sale of the property, foreclosure was unavoidable.

129. The economic damages to the Millers include loss of their investment in the farm property, including construction cost, and loss of the business income expected from the farm for horse farm operations already enumerated plus use of farm premises for an alternative energy business and a publishing business based on works about farm construction and farm life.

130. Expected business income from the farm included all of the following:

   a. As noted, the Millers planned to operate the farm as a commercial horse boarding and show facility beginning in 2008. The income from having five horses boarded there, in addition to the Millers' own horses, was estimated to be approximately $36,000 per year. The income expected from 8 horse shows on the farm per year was estimated to be approximately $84,000 per year. Therefore, the total annual income was projected to be approximately $120,000, projected to last 20 years.

   b. The farm was also a real estate investment. The expected appreciation as an improved real estate investment in a growing and prosperous part of the state,

E & BLASKE, P.L.C.

TORNEYS AT LAW

OUTH MAIN STREET
ARBOR, MI 48104
'34) 747-7055

Page 16 of 19

PB THB 016195

even in hard times, was estimated to be at least $3,000,000 from eventual sale of the farm.

c.   In September 2008, while the Millers were still living on the farm, 4G Innovation, L.L.C., owned and operated by Dr. Miller, submitted a $7,000,000 grant request for funding a Center of Energy Excellence (C.O.E.E.) for Hydrogen Production from Renewable Energy (Wind and Solar), Storage and Use in Hydrogen Powered Vehicles at the Lima Township farm. Action to complete the application after an initial review was suspended because the Millers were forced to move. At this time, C.O.E.E. has awarded 6 grants from 2 rounds. The first round in 2008 had a budget of $43 million and the second round in 2010 had a budget of $30 million. A123 Systems received $10 million in Ann Arbor for battery development. Partners in the C.O.E.E. Hydrogen proposal were 2 commercial companies in the hydrogen production and hydrogen dispensing business and a well-regarded University of Michigan. The grant request was for $7 million to the State of Michigan's new alternative energy office under the new C.O.E.E. law. The farm was to be an experimental research facility to demonstrate hydrogen production from solar arrays and wind turbines, the storage of hydrogen, the use of hydrogen to produce electricity back to the grid, and the dispensing of hydrogen into vehicles. A business plan in the C.O.E.E. Hydrogen proposal described how the results of the planned research, with partners and the demonstration facility located on the farm, would be commercialized in a business expected to produce a ramp

E & BLASKE, P.L.C.

TORNEYS AT LAW

OUTH MAIN STREET
ARBOR. MI 48104
(34) 747-7055

Page 17 of 19

PB THB 016196

of income beginning in about 2012 that eventually would reach many millions of dollars of revenue.

d.    Beginning in September 2009, after the Millers had moved off the farm, the Federal Department of Energy (D.O.E.) requested SBIR grant proposals amounting to approximately $2 million for exactly such a research project, facility and business plan. Had the Millers been able to remain on the farm, it is highly likely they would have obtained funding and therefore have prevented foreclosure. Because the farm was no longer available as a research facility for solar, wind and hydrogen research and development, all business revenue from alternative energy was lost in 2009 and for all future years.

e.    In May 2008 The Innovation Extension Center, L.L.C. submitted a proposal for a $1 million grant in a partnership with Professor Jun Ni of the University of Michigan. Moving away from Lima Township terminated the Millers' relationship with Professor Ni.

f.    Beginning in 2008 Cloverfield Publishing was founded by Plaintiff Janet Miller. A book was written from notes and photos taken from 2003 through 2006 about the construction of the Dexter farm, entitled""The Reality of Building a Horse Barn and Farm". The book was to be edited and released for publication in 2009. Work was slowed on the book because of the litigation and loss of the farm. Estimated book revenue from 2009 through 2015 was about $1 million based on $50 per book and 20,000 copies. Several other

& BLASKE, P.L.C.

DRNEYS AT LAW

UTH MAIN STREET
RBOR, MI 48104
14) 747-7055

Page 18 of 19

PB THB 016197

works were written about the Lima Township farm. The total loss of revenue for Cloverfield Publishing due to loss of the farm is estimated at about $2 million. Revenue from consulting about the Dexter farm construction and operation was also part of the expected income.

128.  Losing the farm was for the Millers like the death of children or imprisonment for life. The violation of the ordinance had potential fines of $500 per day and 90 days in jail per violation. The number of days in violation was approximately 2,000. The potential for fines and imprisonment still exists. All the buildings on the farm potentially would also have to be taken down. Recovery by the Millers using monetary compensation for damages would not permit building another farm because of the age and health of the Millers. It has even had detrimental physical health effects on each of them.

WHEREFORE, Plaintiffs, and each of them, ask for Judgment against Defendants, and each of them, in whatever amount they are found to be entitled, plus costs, interest and attorneys fees.

Dated: January 17, 2011

Thomas H. Blaske (P26760)
John F. Turck IV (P67670)
BLASKE & BLASKE, P.L.C.
Attorneys for Plaintiffs
500 South Main Street
Ann Arbor, Michigan 48104
(734) 747-7055

& BLASKE, P.L.C.

ORNEYS AT LAW

OUTH MAIN STREET
ARBOR, MI 48104
34) 747-7055

Page 19 of 19

PB THB 016198